I'd like to reserve seven minutes of my time for rebuttal. Watch the clock, and I'll also try to help you. So when the clock says seven, then that's it. You'll have 13 minutes of argument. May it please the Court, I'm Eric Christensen for Winding Creek Solar. I'd like to start with the lower court's error in refusing to provide an effective remedy in this case. The plain language of the statute says that in an implementation challenge like this one, the Court has the authority to provide such injunctive or other relief as may be appropriate. The Court simply ignored that language here, jumped to the descriptions of implementation versus as-applied challenges, and said we had to go to an as-applied challenge to get an effective remedy. That simply ignores the plain language of the statute. Further, as-applied challenge simply doesn't apply here. This is plainly a implementation challenge because an implementation challenge is a challenge to the implementation of FERPA by the State commission. That's clearly what this is here. There's no, not even a utility involved in this case as a party, and that would be required to have an as-applied challenge. And it doesn't the case doesn't suddenly become an as-applied challenge when you get to the remedy provision. But even if you're right, as I'm not sure, for purposes of my question, I'll assume you are, the district court had jurisdiction to decide the question. Yes. Your client is arguing that you had a right retroactively to accept an illegal plan. Is that what you're arguing? You wanted the higher price under a plan that you argue is illegal. No. The plan is not illegal, per se. The problem is that if we had gotten the $89.23 contract at the time that the client was ready to serve PG&E, that would have been proper. Well, I understand that's what you want, but that plan is improper for, among other reasons, that plan has a cap on it. So if the cap was taken away, the client would have gotten the $89.23 contract. But that's having us reform the contract, essentially. It's not reforming the contract. The contract would have been the contract that the client, that Winding Creek would have gotten, but for the illegal cap. Well, but that's the contract. Right. And the standard remedy is to the standard remedy in cases of agency error like this is to restore the wronged party to the position they would have been in, but for the illegal conduct. The illegal conduct in this case is the 5 megawatt cap that was improperly applied. Well, it's also the ---- In the absence of that, Winding Creek would have gotten that contract for $89.23 for 20 years. Well, it's also, and you may or may not agree with this, the district judge says not only is the cap illegal, but the method of calculating the price is illegal. Yes. The starting point for calculating the price was not illegal. That's the 89.23. So you're claiming if we do have jurisdiction or if the district court did have jurisdiction, you had a right to accept a price under a contract that was illegal on two grounds? So the ---- let me ---- again, the illegal part of the program is the cap and the arbitrary $4 downward adjustment to the price. Right. We agree that the initial price was a proper avoided-cost rate because it was based on a bidding process in which all eligible parties participated. That's not the case with the downward adjustment in which only qualifying facilities participate. That doesn't measure the avoided-cost rate of the utility, which is required under the statute. Under this Court's case in independent energy producers, it measures the willingness of qualifying facilities to keep reducing their prices until they can get a contract. And that's just not what the statute requires. If we were to disagree with you and say that the district court's ultimate determination not to affect the remedy that you want, but we were to agree with you with respect to the plan or the contract and the plan remat being not compliant with PRPA, then where would that leave you as a possible down the stream for being able to affect a remedy for the illegal or the improper? In a very bad place. And the reason is the program that the CPUC has proposed would result in a contract of only 3 years, not 20 years, and at some rate likely to be much lower than the 8923. So we would not be restored to the position we would have been in had the CPUC not committed this error. And do you agree that we should be reviewing the district court's denial of your injunctive relief that you request for an abuse of discretion? No. This is a legal error. This Court simply improperly applied the plain language of the statute. Unlike the substantive part of the case, where there was a trial, a bench trial, and the findings of fact there are — it's a clear error standard. But this is a — the remedies question is a legal error, and it's subject to de novo review. So — and, I mean, on the as-applied question as well, I mean, it's worth pointing out that the statute forecloses the possibility of using the as-applied part of the statute, Section 210G, in this case, because these are — this involves a wholesale rate that's clearly subject to FERC's jurisdiction under Part 2 of the Federal Power Act, and under Section 210H1 of PRPA, it says that subsection G shall not apply to the operations of an electric utility or a qualifying facility that are subject to the jurisdiction of the commission under Part 2 of the Federal Power Act. So the — it would not be possible for the State court proceeding under Section 210G to address this question. Let me see. I think, finally, the State argues that the Eleventh Amendment bars the — although the Court didn't address this, the Eleventh Amendment bars the request for relief in this case. That's simply incorrect. The Verizon — Supreme Court's decision in Verizon, Maryland, is directly on point. It says that because there's no possibility for the relief to be taken from the State Treasury, the past liability of private parties doesn't — isn't barred by — doesn't make the relief barred by the Eleventh Amendment. The same is true of the First Circuit's decision in Vaqueria-Tres Manjitas And I — forgive me for my schoolboy Spanish pronunciation. But that case is directly on point. The Court concluded that because the relief would come from private parties, not from the government purse, even though the relief would be for violations dating back six years before the decision of the Court, just like in this case, that did not implicate the Eleventh Amendment. Finally, yeah, I think — finally, the other ground for the Court, the — the argue that where the Court erred is the citation to the First Circuit's opinion in alcohol renewables. There — there was no long-term rate that had been established by the State commission. That is not the case here. We know the long-term rate that that Winding Creek would have gotten, but for the error, $89.23. So there's no possibility of interfering with the jurisdiction of the State commission here. They've already done their job. It's simply a matter of the Court exercising its discretion to restore Winding Creek to the position they would have been, but for the legal error that the Court found. Turning to the substance of the case, and again, I emphasize that there was a bench trial here. There are findings of fact that are subject to the clear error standard. There's plenty of evidence in the record to support the judge's conclusions that the — the program did not meet the standards of PURPA, and the CPUC just points to contrary evidence in the record. That doesn't meet the clear error standard. There's simply no clear error by the judge here. All of his findings of fact were fully supported by the record evidence, particularly the testimony of our expert, Dr. Lesser. With respect to the specifics that the district court found, the 5-megawatt per month cap is a plain violation of PURPA. That is clear from FERC's hydrodynamics decision, which is directly on point here, and it plainly violates the requirement that a qualifying facility be permitted to sell its output to the electric utility at avoided cost rates at the time that it's ready to sell. The market adjustment mechanism violates PURPA as well. As we discussed, it doesn't measure the avoided cost of the utilities. In addition, it uses this arbitrary 4-megawatt adjustment mechanism. There's no market in the world that adjusts in 4-megawatt — $4 increments. There's certainly no — more to the point, no utility in the world whose avoided costs adjust by — in $4 increments. Finally, the standard contract, which is really the crux here because the CPUC's attempt to save its program is to say the standard contract complies with PURPA. That is not the case. The standard contract contains at least three variables that cannot be calculated at the time that Winding Creek was willing to undertake the obligation to sell to PG&E. And the FERC's regulations, 40 years of precedent, plainly require that in order to be compliant with PURPA, the QF has to have the option to sell at a price that's set and determined at the time that the obligation is incurred, not at the time that the power is actually delivered. The standard contract does not provide that option, and that's why it doesn't comply with PURPA. Sotomayor, you categorize your implement — your — what you're arguing here as an implementation claim. Yes. And one bought against the State agency like CPUC. Yes. But is that really what's an implementation claim? Because the very remedy that you seek is directed squarely at PG&E, isn't it? Directed at the — the remedy would be to order the State commission to do what it should have done in the first place. Then PG&E would be required to enter into the contract. If PG&E refused to enter into the contract, then we would have an as-applied challenge against PG&E to be brought in State court under Section 210g. Until that happens, this is a straightforward implementation challenge. The language of Section 210h-2, providing the Court with discretion to provide any — any appropriate remedy, is what applies here. The Court erred in failing to even acknowledge that language, let alone apply it or come up with a remedy that puts Winding Creek in the position they would have been absent the error by the CPUC here. But why — why do you need the CPUC to order something if the Court were to determine that the — California was simply wrong in how it's interpreting these things? Why wouldn't you then demand that PG&E do it, and then PG&E either does or doesn't, and then you have your as-applied challenge? Well, if PG&E was a party to this case, I suppose that would be a possibility. I mean, after the case, you could say. So, I mean, we're working within an administrative law framework here where the CPUC is the primary entity carrying out the — I understand. The purport in the State. And so the — I think the remedy has to be directed to the CPUC in the first instance. But PG&E is ultimately the party to the contract that you want. Yes. And PG&E is subject to the jurisdiction of the commission. Correct. The California commission, if the Court orders the remedy that we're requesting through the California commission, PG&E presumably has to apply. And if it has to comply, and if it doesn't, then, again, we would have the option to sue them under Section 210G, because that's an as-applied challenge. The refusal of a utility to comply with lawful purpose orders from the State commission. You want to save your remaining time. Yes, I do. Thank you. Thank you, Your Honors. Christine Hammond for the CPUC. May it please the Court, as is evident from the briefs, a threshold question in this case is whether the standard contract for QFs, 20 megawatts or less, satisfies the requirements of FERC's regulations. Winding Creek argues that the standard contract does not satisfy one of the key provisions of the FERC regulations, and that is 18 CFR 292.304D22. For the convenience here, I will refer to this as the D22 requirement. The CPUC submits that the standard contract complies with FERC's regulations under 18 CFR 292.301, as FERC found. Litigated in the case below, the standard contract determines one avoided cost price. Now, that single price paid to every QF, whether it offers capacity — whether it — even if it offers only energy, is comprised of two components. There's a capacity portion, which is fixed. That number is known at the time of signing the contract. It can only go up from the time of signing the contract. It never goes down. There's also an energy portion. That's what we refer to as the short-run avoided cost. That portion of the rate is a formula, with the component parts of that formula known at the outset and signing the contract. Some of the inputs of that formula are things like monthly market gas price indices and monthly heat rates. Let me ask you, though. You seem to concede in your briefs that the current standard contract does not offer an avoided cost rate calculated at the time of delivery. So why isn't, then, the standard contract noncompliant under PRPA based on that admission alone? Because the standard contract complies with the FERC's regulations pursuant to Section 301, as FERC determined in the Winding Creek Orders. When Winding — before Winding Creek filed the Federal action below, it sought enforcement at — at FERC. And it challenged the standard contract as not meeting the requirements of D-2-2. FERC responded by saying the standard contract is the CPUC's primary PRPA program, and it satisfies the FERC's regulation and is a proper implementation of — of PRPA under Section 301. So what — what analysis did FERC give us as to why it complied? Because as I read the district court opinion, as I understand Judge McGeeh's question, in order for it to be a valid exercise of power, of authority, there has to be two prices offered. One is at the time of delivery of the energy, and the other one is at the time of entering into the contract. The judge says you did only one of those two things. And I don't — I don't see how you can get around that. That's just in the statute. That is — that is in the regulations, Your Honor. What is also in the regulations is Section 301. That sets out the scope of Part 292 of the regulations. And Part 292 includes D-2-2. Section 301 says only three things, that it governs the contracts between QFs and utilities. It says that QFs and utilities can negotiate prices, terms, and conditions that are different from those otherwise required by other provisions of the regulations, including D-2-2. But — So it seems like you're arguing that because FERC said it's compliant, you're okay. Is that what you're arguing? FERC is — yes, I am arguing that. Okay. But it seems like we've held before that an agency conclusions that are — that determine plainly erroneous or inconsistent with regulations don't require that deference be given under, you know, the hour deference. And it seems like here, FERC never commented on the availability of the avoided cost options under the standard contract. And so I'm just trying to figure out how does the standard contract, including with your own admission, how does — it seems like the standard contract fails to offer these options. So can you respond to that? Why does FERC get our deference here? Sure. FERC, when it referred to Section 301 in the Winding Creek Orders, also referred to, in a footnote, the comprehensive QF settlement of which the standard contract is a part. That QF settlement was an agreement between the utilities in California and the vast majority of QFs in California at the time, as well as some consumer groups. That was a settlement agreement that the Commission adopted as a rule as its primary program. Now, if you look at the language of Section 301, together with the reference to the QF settlement, the only logical conclusion that you can reach is that FERC recognizes the settlement and the standard contract as an agreement between the utilities and the QFs in California with rates, terms, and conditions that are different from those otherwise required by the remainder of the regulations, including D-2-2. Let me ask — to kind of cut to the chase to a little more simple view of it. And that is — it seemed to me that what I thought FERC was saying in a variety of its orders and statements was, you can have different contracts and different programs, but you need one compliant program. Is that a baseline? That is a baseline. Every State is required to comply with FERC's regulations. What this Court has stated is that States should implement the FERC's rules and by any means reasonably designed to give effect to FERC's regulations. So if — if we just take my premise, like, you need one compliant program, and then you can go off and, you know, innovate however you might. That is FERC's holding. And that's its interpretation of all these various things. But if, for example, this remat program is not a compliant program, then that would force you into the situation of determining, is the standard contract a compliant? Is that correct? That's — that is correct. That is the threshold question that I'm pursuing. So if we determine that the remat is not compliant, then we're forced over to this contract situation. And now we're in the standard contract situation. And I know they've indicated they might amend it later, which almost seemed to me like an acknowledgement that there were some deficiencies. But that's not the contract we're dealing with, the what might be contract. We're dealing with the what is contract. So if we look at the what is contract, the current standard contract, we go back to the pricing in that contract such that we can then say, okay, well, maybe remat doesn't get you where you need to go, but this contract does. So if the Court doesn't accept FERC's reference to Section 301 as the standard contract complying with FERC's regulations, I have unpackaged a bit of the standard contract and — and that — that it provides one rate, one portion of it is fixed and known with certainty at the outset of signing the contract. The other portion is — is what we call the short run avoided cost. That can vary over time. But in order to be reasonably designed to give effect to FERC's regulations, there is a fixed and known component. It's generally referred to as the capacity portion, which generally covers investment costs. So if an investor needs to know with some reasonable certainty whether or not to invest in a QF, that investor has that with this capacity portion. But that looks to the cost of the generator. The — looks to the cost of the QF. But you're supposed to calculate cost on avoided costs that is to say what you would pay to somebody else. So I understand the rationale for the calculation, but that's not the rationale that the — that the regulation requires.  GOTTLIEB You — you indicate somehow that's absorbed, if you will, or reflected in the energy short run avoided cost. But I'm having some trouble understanding that argument because it doesn't get you to the requirement of what the QFs are entitled to. MS. WHEELER Which is the dual — which is the D-2-2 requirement, Your Honor? MS. GOTTLIEB Yes. MS. WHEELER That gives them a degree of certainty. It's not a fixed number. It can vary. But there is this capacity portion, which is known with certainty. So we would urge that that is reasonably designed to give effect to D-2-2. Now, if the Court — KING But I still don't understand your answer to my question, which is to say the capacity part of that is based upon the cost of the QF, that is to say based on the cost to the person or entity generating the energy seeking to sell it to the utility.  WHEELER Right. KING But the cost required by the — by the calculation required by the regulation has nothing to do with the cost of the generator of the electricity. Rather, that cost is what's the avoided cost that you would have paid to somebody else. So this just — these are not the same calculations. MS. WHEELER It was negotiated between QFs and utilities. They have — KING You say between some QFs and utilities. On the other hand, so they negotiated something that's not permitted under the regulation. So does that — does that help you? MS. WHEELER It is permitted under the regulation, under Section 301. MS. KING But Winding Creek was never a party to the settlement agreement that resulted in the standard contract. So it seems like any argument that Winding Creek and CPUC contracted around, you know, purpose, requirement to provide avoided costs, I just — I'm not quite following that.  WHEELER Sure. That was adopted as the rule in California. Any QF that disagrees with the standard contract can come in to petition the CPUC to modify that rule. But under the REMAT program, Winding Creek was in the queue and had been offered a contract beginning in March 2014. For three and a half years under the REMAT program, it was offered a contract, and it declined that contract. I'm going to move, Your Honors, to our appeal, and that is addressing some of the district court's findings regarding the REMAT program. MS. KING And would you also make sure you leave time to talk about the remedy issue? MS. WHEELER Of course. MS. KING Thank you. MS. WHEELER Very quickly, the REMAT program found that — the district court found that the REMAT program violated purpose — mandatory purchase obligation with the statutory cap. Now, states have broad discretion to design their procurement portfolios. The state of California has mandated that the CPUC develop a feed-in tariff targeting renewable generation, and that is the REMAT program. We've explained in the briefs that the existence of the REMAT program with the statutory cap can only be affected through PURPA. We need PURPA to target these renewables and to offer higher prices. It's only with the existence of the standard contract as the groundwork for the CPUC's compliance with PURPA that we can even have the REMAT program. I think Your Honors have — do appreciate that point. MS. KING So it all goes back to the contract, in your view?  WHEELER Yes. MR. RUBENSTEIN So I just understood you to concede that the REMAT program, standing on its own, is not — is not compliant.  WHEELER That's correct. MR.  MS. WHEELER And that is based on FERC's clarification order. MS. KING Right. WHEELER And FERC's Winding Creek orders. MS. KING So then we're really back to the first part of your argument about compliance of the standard contract, correct? WHEELER That's right. MS. KING And in your view, the district court made findings that constitute clear error leading to its conclusion? WHEELER I think its conclusion was in error. And that is because it didn't give proper deference to FERC. And to go back to Judge McGeeh's point, it — these — this was — it was thinly argued, but I have discussed how the only logical conclusion is that the reference to Section 301 refers to the agreement between QFs and utilities in the settlement contract. Now, this Court in Basiri has given deference to agencies in the interpretation of their regulations, even with informal orders. FERC itself has said that its declaratory orders are entitled to precedential effect. Now, if this Court doesn't accept that, like the district court, that these declaratory orders are not entitled to deference, I will refer to the D.C. Circuit in Xcel Energy Services that's identified in the briefs where the — where the D.C. Circuit was reluctant to give deference to FERC in its declaratory order interpreting PURPA. And in — but it did say that it — it is not entitled to much deference unless and until a district court adopts that declaratory order. I will refer to the central district, which did discuss the first Widening Creek order, where the — the FERC referred to the standard contract and found that it — that it's — that the REMAP program does comply. The REMAP program and the standard contract do comply with FERC's PURPA regulations. But it would seem like an odd situation to me that you'd have — of course, the D.C. Circuit's only looking at district courts within its circuit there, which is a single district court. But it seems odd to me you could say, well, the Central District of California found X, and therefore, that would bind the district court here. Is that basically what you're saying? That is what I'm saying. And the district court here did not — it took a different opinion. Right. And so I'm just having some trouble, given the setup and the lineup in the D.C. Circuit, that you — how you would apply it in the Ninth Circuit. So it's — it's like the first — first to file, so to speak, now they're the first district court to come out with an opinion. Then your suggestion is that every district court in the circuit would be bound by that opinion? Yes. That — that first district court had upheld the REMAP program. Okay. Just wanted to understand that I understood the scope of your position. What's the current status of CPUC's newly proposed standard contract for QFs 20-milliwatt or less? It's still a valid contracting option. Some — not many at all — QFs are still accepting those standard contracts. It — there's no cap on procurement, and there's no — there's no expiration date. There's no end date for the availability of that contract. I do want to point out, for Your Honors, that if this Court ultimately determines that the avoided-cost rate under the standard contract is not a reasonable — is not designed to give reasonable effect to FERC's regulations, just to point out that we had filed a request for judicial notice concurrent with our fourth brief, and to identify for the Court that the CPUC has a current rulemaking in place in light of the Winding Creek order to remove any doubt or ambiguity as to whether or not there are contracts that provide a hard number calculated at the time of signing the contract to remove any question. If necessary — So we can take judicial notice that there is a rulemaking, but that we don't have a rule. Is that right? Not yet. Okay. So I'm not sure where it would get you. And we might — Let me go to the remedy issue, though. I think it does hit on the remedies. Yes. So with respect to the remedy, of course, Mr. Christensen says you can go through all this and determine that we have — the standard contract is not compliant, but unless there's a order by the California Commission ordering entry into the appropriate contract, they're left with no remedy. Is that true? Not at the current time. And that is the enforcement and remedy scheme that was envisioned by Congress when it enacted PRPA. It restricted the remedies that Federal courts can grant to QS. And the proper remedy, if a State is not properly implementing PURPA, would be to send the State back to implement PURPA correctly. It's not — courts do not engage in ratemaking. They don't grant contracts, certainly not retroactive relief here, certainly not damages, which this request for a specific dollar amount is more akin to. The remedy is only that State go back, rectify your deficiency, and offer those — a legal option to the QFs. Well, how does — how is the deficiency rectified here? The deficiency would be rectified by offering QFs, including Winding Creek, a contract option with a price calculated at the time of signing the contract. Now, the CPUC has filed an appeal asking this Court to affirm the component parts of the remat program that the district court found were illegal. And I see my time is up. Well, just on that last point, though, I thought you had essentially acknowledged that the remat program wasn't compliant, and that's why we're talking about the contract. I'm — to clarify, I am not acknowledging that the remat program is not compliant with PURPA. Its validity does depend on a foundational primary PURPA program that does comply with PURPA. Okay. So it's a — we're saying the same thing, then. Thank you. Thank you, Your Honors. So I want to make sure. You conceded the remat on its own is noncompliant. But it's compliant in your view only because the standard contract is compliant. That's true. Yes, Your Honor. Standard contract or a new standard contract. Or a new contract. Or a new one. Yeah, yeah. Got it. Thank you, Your Honors. Thank you. So let's start with the standard contract, which we all agree is essential to any PURPA compliant program in California. Ms. Hammond concedes that there's not a fixed number in those contracts. That makes it not FERC compliant because 40 years of FERC precedent says you have to have the option of a contract with a fixed price at the time that the QF agrees to start selling. That doesn't exist under the standard contract. The California program is, therefore, not PURPA compliant. Let's discuss the Winding Creek orders for a second. These are the FERC orders that address Winding Creek's complaint sort of initially. The problem with the FERC orders is that they don't address the key evidence in this case, which is that there's no fixed number in the standard contract. It just says there is a standard contract, and that seems good enough. It doesn't explain why. It doesn't explain the departure from 40 years of precedent. It doesn't explain why FERC came back and reached the opposite conclusion after those orders in the Windham-Soler order. And so the Court owes no deference under any standard to the agency's failure to explain its departure from precedent, its departure from the plain language of the rules, and its failure to address the key evidence in the case. And in addition, it does all of that in a single footnote that just describes in general terms what the standard contract is without explaining why it's compliant. And as this Court said in Idaho Power v. FERC, the lonely footnote is insufficient to support a departure from the agency's The district court was absolutely right that it didn't provide any guidance on the key questions in this case. The --" let me see. Let me address the Section 301 argument. Section 301 just says that QFs and utilities can voluntarily agree to a contract that departs from PURPA. It doesn't say that once a voluntary program is agreed to by some set of QFs, it can bind all other QFs. Winding Creek was not a party to those orders and, therefore, can't be bound under Section 301. It is entitled to a PURPA-compliant contract in this case. That is lacking here. In terms of --" let me see. The contract offers that were declined. The problem with those contract offers is they weren't at avoided-cost rates. They were subject to this arbitrary $4 reduction, which has nothing to do with the utilities, and, therefore, those contracts were not PURPA-compliant. In terms of the central district's conclusion, the court there did not conduct or did not undertake fact-finding, as the Court did in this case. The deference, the real deference that's due in this case is to the district court here, who undertook a fact-finding, a bench trial, made conclusions of facts based on the evidence before it. That did not exist in the central district case. There's no reason to defer to the central district. And, in fact, the --" it's not even clear that the same arguments were made to the court in the central district. The --" in terms of the remedies question, I mean, the --" I think Ms. Hammond's answers to your questions underscore the problem with this case, the problem with the remedy that they offer, which is no remedy at all, really. They say at some point, maybe two or three years down the line, Winding Creek will have a contract option. The fact is the contract option will be a far cry from what it would have had in the absence of the legal errors committed by the CPUC in this case. As I said, at most, a three-year contract, as opposed to the 20-year contract Winding Creek would have had, and at some price well below what Winding Creek would have had back in 2013 when it was ready to deliver the power in this case. In any event --" Kennedy, let me ask you this. Ready to deliver the power, has Winding Creek actually constructed or finished constructing the facility at Lodi? Winding Creek had to be in a position to be ready to deliver power within 24 months of the time it committed to the remap program. It's been waiting to complete construction. It's completely permitted and so on. It's been waiting to complete construction for the contract to go into effect. So how far --" and I understand this is outside what the record requires me to know, but how far along in construction is Winding Creek? So my understanding --" I don't know the exact answer to that question, but my understanding is that the permitting has been completed. It's ready to put metal in the ground. But none has so far been done? So, no. And you can't --" I mean, without a contract to pay for the output, nobody's going to finance the project. Right. I mean, and that's the part of the problem with the lack of remedy here is we should have had this contract back in 2013. Here we are six years later still waiting, still waiting on the CPUC to act on a program that's likely doesn't comply with a permit. And your practical problem is that the avoided costs are coming down. Well, and that's true. But, you know, again, if we had gotten the contract we were entitled to in 2013, the avoided cost would have been $89.23. That's undisputable. And that's the contract that we would have gotten, but for the legal error. The problem with the CPUC's argument on the remedy is it ignores the plain language of the statute which says the district court had the discretion to order any appropriate remedy that certainly putting Winding Creek into the position it would have occupied, but for the CPU's error, legal error, is the appropriate remedy in this case. And the district court just refused to consider that. But Winding Creek turned down that initial offer, correct? No. We would have accepted the initial offer, but we were barred from that contract by operation of the 5-megawatt monthly cap. But there was the cap that prevented it. Yes, right. And we were randomly assigned a position lower than the QFs that actually got the contract. So it's, you know, a happenstance that we were denied, but it's clearly because of the cap. The cap is clearly illegal under the hydrodynamics program. And the statute clearly authorizes the district court to restore us to the position we would have been in, but for that legal error. Thank you. Thank both counsel for your very excellent argument this morning. Winding Creek v. Petterman is submitted and we're adjourned for the morning.
judges: McKeown, W. Fletcher, Murguia